# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 2:13-cr-00059** |
| **ROBERT OLDHAM JR.** | : | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

Defendant Robert Oldham Jr. seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied, given the danger that the defendant presents to the community and its children.

## I. Background.

### A. Criminal Conduct.

On January 10, 2013, a federal criminal complaint was filed against defendant Robert Oldham Jr. charging him with violating 18 U.S.C. § 2422(b), coercion and enticement, and 18 U.S.C. § 2251(a), sexual exploitation of children. On January 11, 2013, Oldham was arrested and has been incarcerated in federal custody ever since. On February 7, 2013, a grand jury in the Eastern District of Pennsylvania returned a two-count indictment presenting the same charges. On July 11, 2013, Oldham pled guilty to Count Two only, the offense of coercion and enticement. On January 29, 2014, the Court

imposed a sentence of 10 years' imprisonment, and a term of supervised release of seven years.

From October 2012 through early January 2013, Oldham enticed a 15-year-old minor, D.M.V., over the internet via Skype from his parents' home. During their Skype sessions, which involved both cameras and chat, he directed her to expose herself to him on multiple occasions, and to masturbate on camera, while knowing that she was 15 years old. After multiple lurid chat sessions, D.M.V. spent the night with Oldham, during which they engaged in sexual intercourse. During the execution of a search warrant, Oldham was interviewed, and post-*Miranda* warnings, confessed. Oldham admitted knowing that D.M.V. was underage and stated to law enforcement that having sex with an underage girl was part of the "thrill." Oldham further admitted to law enforcement that he had chatted with other minors, including an eight-year-old girl. Oldham stated that it was likely that law enforcement would find child pornography on the computer that was seized from the house (law enforcement did find child pornography on compact discs located by the computer, but not on the actual computer itself).

The defendant is serving his sentence at FCI Fort Dix, with an anticipated release date of July 19, 2021. He has served approximately 95 months, and has credit for good conduct time of approximately 13 months, for total time served of approximately 108 months. He has not committed any disciplinary infraction during his time in custody.

**B.     Request for Compassionate Release.**

On June 7, 2020, the defendant submitted a request for compassionate release to the warden. The request was based on the following medical conditions: IgG Deficiency,

asthma, and respiratory vulnerability, as well as the risk presented should the defendant contract COVID-19. On November 18, 2020, the defendant, pro se, submitted a motion to this Court for compassionate release.

The undersigned obtained the medical records of the defendant for the past year from BOP. The records reveal that the defendant, who is 38 years old, presents a history of asthma, and was a smoker. The defendant was most recently treated in March 2020 for acute bacterial sinusitis. The defendant otherwise is fully ambulatory and engages in all normal activities of daily living (ADLs).

The BOP assessment is that Oldham's asthma is "mild intermittent." He has been prescribed a Mometasone Furoate inhaler for daily use, and an Albuterol inhaler for use as needed. During the past two years, he has not reported any asthmatic episode. At the most recent annual check-up, on February 21, 2020, the examiner wrote, "Patient states he is doing well. Asthma is well controlled. Last use of albuterol inhaler was 6 months ago. He denies any wheezing or problems related to exercise. Denies night time symptoms, cough and no difficulties with ADLs."

As noted, Oldham states he suffers from IgG deficiency. However, there is no record of that in the BOP records. A medical resource states: "An IgG deficiency is a health problem in which your body doesn't make enough Immunoglobulin G (IgG). People with IgG deficiency are more likely to get infections. IgG deficiencies can occur at any age."[1] At the time of the presentence investigation in November 2013, Oldham

---

[1] https://www.hopkinsmedicine.org/health/conditions-and-diseases/igg-deficiencies#:~:text=An%20IgG%20deficiency%20is%20a,proteins%20called%20immu

"explained that he was born with IgG Deficiency, which made him more vulnerable to infection and caused respiratory problems." PSR ¶ 48. However, not only is this condition not mentioned in the BOP records, but he has not experienced regular infections or respiratory problems while in custody.

### C.     BOP's Response to the COVID-19 Pandemic.

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at

https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at

https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The

---

noglobulins%20or%20antibodies (accessed Dec. 27, 2020).

plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Presently, BOP operations are governed by Phase Nine of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

BOP is endeavoring to regularly issue face masks to all staff and inmates, and strongly encouraged them to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms, and also placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, all facility staff are screened for symptoms, through daily temperature checks and mandatory self-reporting of symptoms.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits are very limited, but permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of this filing, the total number of inmates placed in home confinement from March 26, 2020, to the present (including inmates who have completed service of their sentence) is 19,225.[2]

---

[2] This Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b)

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

BOP's aggressive efforts have extended to FCI Fort Dix, the largest U.S. federal prison in terms of capacity, with some success thus far. At FCI Fort Dix, which currently houses 2,788 inmates, there was an early outbreak in May, in which 36 inmates at the camp that is part of the institution tested positive for COVID-19. All recovered, and there was no death at the facility. At the time, a federal court in New Jersey rejected an action brought against the facility seeking declaratory, injunctive, and habeas relief, presenting a detailed opinion recounting BOP's efforts. *Wragg v. Ortiz*, 2020 WL 2745247 (D.N.J. May 27, 2020). At that time, and as the months passed, there was no positive case at all in the far larger FCI. Courts recognized this. *See, e.g.*, *United States v. Phillips*, 2020 WL 5076753, at *4 (E.D. Pa. Aug. 27, 2020) (Surrick, J.) ("The efforts made by the BOP at

_____

(BOP's designation decision is not subject to judicial review). *See also, e.g., United States v. Gray*, 2020 WL 6822949, at *2 (E.D. Pa. Nov. 20, 2020) (Sanchez, C.J.); *United States v. Rodriguez-Collazo*, 2020 WL 2126756, at *2-3 (E.D. Pa. May 4, 2020) (Younge, J.); *United States v. Pettiway*, No. CR 08-129, 2020 WL 3469043, at *2 (E.D. Pa. June 25, 2020) (Bartle, J.); *United States v. Torres*, 2020 WL 3498156, at *5-6 (E.D. Pa. June 29, 2020) (Kearney, J.); *United States v. Cruz*, 2020 WL 1904476, at *4 (M.D. Pa. Apr. 17, 2020); *United States v. Mabe*, 2020 U.S. Dist. LEXIS 66269, at *1 (E.D. Tenn. Apr. 15, 2020) ("the CARES Act places decision making authority solely within the discretion of the Attorney General and the Director of the Bureau of Prisons. . . . This Court therefore does not have power to grant relief under Section 12003 of the CARES Act.").

FCI Fort Dix have proven successful."); *United States v. Moses*, 2020 WL 5117978, at *4 (E.D. Pa. Aug. 31, 2020) (Padova, J.).

Then, another and larger outbreak occurred in October, mostly in one specific unit (no. 5812), in which almost all of the 200 inmates tested positive. That outbreak has been stemmed, but new cases continue to emerge. BOP responds to each outbreak with rigorous quarantine practice that have proved effective in limiting further spread. At present, there are 150 reported cases in the entire institution, and a total of 351 current inmates are deemed recovered. It remains the case that there has been no COVID-related death.

## II. Discussion.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Accordingly, the relevant policy statement of the Commission is binding on the Court. *See Dillon v. United States,* 560 U.S. 817, 827 (2010) (where 18 U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).[3]

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are

---

[3] Prior to the passage of the First Step Act, while the Commission policy statement was binding on the Court's consideration of a motion under § 3582(c)(1)(A), such a motion could only be presented by BOP. The First Step Act added authority for an inmate himself to file a motion seeking relief, after exhausting administrative remedies, or after the passage of 30 days after presenting a request to the warden, whichever is earlier.

Under the law, the inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon,* 560 U.S. at 827-28 (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under Section 3582(c)(2) regarding the imposition of a sentencing modification).

applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

Critically, in application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)    Medical Condition of the Defendant.—
>
> (i)    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii)    The defendant is—
>
> (I)    suffering from a serious physical or medical condition,
>
> (II)    suffering from a serious functional or cognitive impairment, or
>
> (III)    experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B)    Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)     Family Circumstances.—

    (i)     The death or incapacitation of the caregiver of the defendant's minor child or minor children.

    (ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)     Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *See, e.g.*, *United States v. Neal*, 2020 WL 5993290, at *4 (E.D. Pa. Oct. 9, 2020) (Gallagher, J.); *United States v. Adeyemi*, 2020 WL 3642478, at *16 (E.D. Pa. July 6, 2020) (Kearney, J.). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction. The guideline policy statement describes specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. The Third Circuit held: "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). *See also United States v. Roeder*, 807 F. App'x 157, 160-61 (3d Cir. 2020) (per curiam) (not

precedential) ("the existence of a widespread health risk is not, without more, a sufficient reason for every individual subject to a properly imposed federal sentence of imprisonment to avoid or substantially delay reporting for that sentence."), *id.* at 161 n.16 ("Similarly, the existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit."). *See also United States v. Hegyi*, 2020 WL 7090710, at *2 (N.D. Ind. Dec. 4, 2020) ("the presence of COVID-19 in a prison, even in large numbers, does not justify compassionate release on its own.").

The defendant asserts, however, that he suffers from a condition that is a CDC risk factor in relation to COVID-19. The government acknowledges that an inmate who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19 presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in note 1(A), as, due to his condition, the defendant may be less able to protect himself against an unfavorable outcome from the disease. *See United States v. Tartaglione*, 2020 WL 3969778, at *5-6 (E.D. Pa. July 14, 2020) (Slomsky, J.) ("a prisoner seeking release due to COVID-19 must at least show: (1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and (2) an actual, non-speculative risk of exposure to COVID-19 in the facility where the prisoner is held" (quoting *United States v. Somerville*, 2020 WL 1627331, at *20 (W.D. Pa. May 29, 2020)).

The CDC's list of risk factors was most recently updated, based on the latest data, on November 2, 2020. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. It reports a list of conditions that certainly present a risk, with a separate list of conditions regarding which there is insufficient data to conclude anything other than that these conditions "might" put a person at risk. Therefore, inmates with conditions on the latter list do not present an extraordinary basis for relief. "Given the lack of data and certainty regarding this second group of conditions, the fact that Defendant has a condition that may increase his risk for severe illness from COVID-19, without more, does not present an 'extraordinary and compelling reason' under the compassionate release statute and U.S.S.G. § 1B1.13." *United States v. Durham*, 2020 WL 5577884, at *2 (W.D.N.C. Sept. 17, 2020). *See also United States v. Hill*, 2020 WL 6202322, at *3 (E.D. Pa. Oct. 22, 2020) (Schmehl, J.) (court does not consider a condition in the "might" category); *United States v. Moldover*, 2020 WL 6731111, at *9 (E.D. Pa. Nov. 13, 2020) (Slomsky, J.) ("District courts have routinely denied motions for compassionate release based on allegations of only potential COVID-19 risk factors, including asthma and hypertension."); *United States v. Alejo*, 2020 WL 6122528, at *1 (S.D. Ga. Oct. 16, 2020) ("at this point, the Court cannot conclude that the "might" category qualifies an illness as sufficiently serious to warrant compassionate release in and of itself.").

Here, the defendant asserts that he suffers from asthma. However, "moderate to severe asthma" is identified by the CDC only as one of the conditions that "might" pose a risk, and therefore is not a sufficient basis for relief. *See United States v. Goode*, 2020

WL 6445930, at *5 (E.D. Pa. Nov. 2, 2020) (Kenney, J.) (inmate who presents "a history of mild asthma that has recently presented as moderate persistent asthma" does not present sufficient grounds for relief). Further, the BOP records show that the defendant does not present this condition; rather, his asthma is mild and intermittent. There is no evidence that he ever sought or received treatment while incarcerated for any acute asthmatic episode.

The National Asthma Education and Prevention Program describes "moderate persistent asthma" as present if any of the following is true: (i) symptoms occur daily and inhaled short-acting asthma medication is used every day; (ii) symptoms interfere with daily activities; (iii) nighttime symptoms occur more than 1 time a week, but do not happen every day; or (iv) lung function tests are abnormal (more than 60% to less than 80% of the expected value), and PEF [peak expiratory flow] varies more than 30% from morning to afternoon. *See* https://www.uofmhealth.org/health-library/hw161158 (last accessed May 22, 2020). It is apparent that the defendant does not present this condition. *See, e.g.*, *United States v. Towel,* 2020 WL 2992528 (E.D. Pa. June 4, 2020) (Sanchez, C.J.) (mild, exercise-induced asthma not a risk factor; limited Albuterol use, results of respiratory tests, and absence of daily symptoms show he does not have what is defined as "moderate to severe asthma"); *United States v. Slone,* 2020 WL 3542196, at *6 (E.D. Pa. June 30, 2020) (Kearney, J.) (review of records confirms that asthma is mild; "Mr. Slone does not have daily asthma symptoms, use his inhaler daily, or have abnormal lung function. In February 2020, his chest x-ray showed no pulmonary complications"); *United States v. Daniels*, 2020 WL 4674125, at *3 (E.D. Pa. Aug. 12, 2020) (Schiller, J.)

("Although Daniels uses an inhaler, his asthma appears under control. His medical records indicate normal lung volumes and clear lungs and his Albuterol inhaler prescription specifically instructs him not to use it daily, but only as needed to prevent or relieve an asthma attack. Daniels was seen by a doctor in April of 2020 because he reported having asthma problems and shortness of breath at night. But his medical records offer no evidence of distress or diagnosis of severe asthma."); *United States v. Neal*, 2020 WL 5993290, at *7 (E.D. Pa. Oct. 9, 2020) (Gallagher, J.).

The only certain risk factor that Oldham does present is a history of smoking. In its revised guidance issued on October 6, 2020, the CDC added "smoking" to the list of risk factors for severe illness, stating, "Being a current or former cigarette smoker increases your risk of severe illness from COVID-19." The CDC previously stated: "Current cigarette smokers are defined as people who reported smoking at least 100 cigarettes during their lifetime and who, at the time they participated in a survey about this topic, reported smoking every day or some days." https://www.cdc.gov/tobacco/data_statistics/fact_sheets/fast_facts/index.htm (accessed Oct. 15, 2020).[4]

---

[4]  Before the amendment to the guidance, courts held that status as a former smoker does not present an extraordinary reason allowing compassionate release where there is no other or associated health ailment presented. *See, e.g.*, *United States v. Mathe*, 2020 WL 3542177 (E.D. Pa. June 30, 2020) (Kearney, J.) (defendant is 48; history of smoking is not a risk factor without a secondary diagnosis such as COPD; *United States v. Buckman*, 2020 WL 4201509, at *3 (E.D. Pa. July 22, 2020) (Surrick, J.); *United States v. Tranter*, 2020 WL 3841268 (N.D. Ind. July 8, 2020) (denied for Elkton inmate who has served only a year of 60-month child pornography sentence, due to offense and nature of conditions; he has no health effects as a former smoker); *United States v. Jackson*, 2020 WL 4141930, at *2 (S.D. Miss. July 20, 2020) (status as a smoker is

The defendant presents no details regarding his tobacco usage. But what is known is that he has been in custody since 2013, and smoking has been banned in all federal prison facilities since 2006. It is well established that the health risks presented by smoking drop dramatically once a user quits and years pass.[5] Here, moreover, the defendant presents no ailments associated with smoking, such as cancer or significant pulmonary problems. The government accordingly submits the his possible status as a smoker many years ago does not outweigh the other 3553(a) factors militating against release. *See, e.g.*, *United States v. Cates*, 2020 WL 6136212, at *9 (D. Me. Oct. 19, 2020) (no exceptional circumstance where 30-year history of heavy smoking is the only risk factor); *United States v. Kupahu*, 2020 WL 7246911, at *6 (D. Haw. Dec. 9, 2020) (history of smoking of otherwise healthy 45-year-old by itself does not create an

---

insufficient); *United States v. Johnson*, 2020 WL 4057638, at *3 (N.D. Tex. July 20, 2020) ("Johnson's unsupported assertion that he is a former and current smoker— standing alone—does not rise to the level of extraordinary and compelling."); *United States v. Greene*, 2020 WL 4475892, at *4 (D. Me. Aug. 4, 2020) (being a former smoker is not an extraordinary circumstance where the defendant is 40 years old and presents no ailment as a result of smoking).

[5] The CDC states:

- Quitting smoking cuts cardiovascular risks. Just 1 year after quitting smoking, your risk for a heart attack drops sharply.
- Within 2 to 5 years after quitting smoking, your risk for stroke may reduce to about that of a nonsmoker's.
- If you quit smoking, your risks for cancers of the mouth, throat, esophagus, and bladder drop by half within 5 years.
- Ten years after you quit smoking, your risk for dying from lung cancer drops by half.

*See* https://www.cdc.gov/tobacco/data_statistics/fact_sheets/health_effects/effects_cig_smoking/index.htm#reduced-risks (accessed Oct. 15, 2020).

extraordinary circumstance); *United States v. Brady*, 2020 WL 7323366, at *3 (D.R.I. Dec. 11, 2020) ("smoking history alone is not sufficient for this Court to find extraordinary and compelling grounds for release, especially when Ms. Brady is only forty-five years old and does not present with any additional comorbidities.").

Indeed, the other 3553(a) factors that this Court must consider strongly militate against relief. The defendant's medical conditions are appropriately managed at the facility, which is also engaged in strenuous efforts to protect inmates against the spread of COVID-19, and would also act to treat any inmate who does contract COVID-19.

Moreover, he continues to present a danger to the community and its children, and should be required to serve the sentence that this Court imposed for his criminal conduct. The defendant enticed and directed a 15-year-old girl to expose herself to him on multiple occasions, to masturbate on camera, and to have sexual intercourse with him. There is no doubt that at the time of his offense, the defendant was engaging in prohibited conduct that presented a significant danger to the community and children. This conduct took place just seven years ago, when the defendant was 31, and suffering from some of the same conditions he presents today.

The defendant fails to demonstrate how release from a mandatory 120-month sentence for a serious sex crime reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A). A consideration of the factors above shows that release at this point is inappropriate based on the offense of conviction, the defendant's managed medical condition, and the amount of time remaining on the defendant's sentence.

Courts have generally denied release in circumstances comparable to those presented here. *See, e.g.*, *Coleman v. United States*, 2020 WL 3039123, at *5 (E.D. Va. June 4, 2020) (denied because the defendant committed child pornography offenses "while in the presence of family members, usually waiting until they went to sleep to view illicit images….His offense also involved the exploitation and subsequent alienation of his family members, casting doubt on whether placement with his 88-year-old mother is a suitable post-release arrangement."); *United States v. Sims*, 2020 WL 2838611, at *6 (W.D. Wash. June 1, 2020) ("In today's society with smartphones, tablets, laptops, smart TVs, and countless other devices, it would not be possible to place Mr. Sims in home confinement and eliminate his ability to engage in his prior criminal conduct [trading in child pornography]. Further, the pandemic and the CDC's recommended guidelines would only serve to make it more difficult to monitor Mr. Sims's behavior. Because Ms. Sims could engage in his prior criminal conduct at any time from his place of home confinement, effectively monitoring him would require repeated visits to his home. Such visits would enhance the risk of the spread of COVID-19 to the individuals charged with monitoring his compliance. Based upon the foregoing analysis, the court finds that Mr. Sims would be a danger to the community if he were released."); *United States v. Miezin*, 2020 WL 1985042 (N.D. Ohio Apr. 27, 2020) (54-year-old has hypertension and is borderline diabetic; but he committed child exploitation offenses and would present a danger to the community, particularly because these crimes may be committed at home, he would require close monitoring, and that would expose others to the risk of COVID-19); *United States v. Schultz*, 2020 WL 2764193, at *7 (W.D.N.Y. May 28, 2020) (Elkton

inmate is vulnerable, but denied because of "abhorrent" conduct in attempting to meet purported 15-year-old for sex); *United States v. Hahn*, 2020 WL 980185 (D. Minn. Feb. 28, 2020) (compassionate release would not be appropriate in child abuse case given the nature of the conduct, the fact that release would undermine the 15-year mandatory sentence dictated by Congress, and in light of the defendant's conduct in prison); *United States v. Stone*, 2019 U.S. Dist. LEXIS 182081, at *32 (S.D. Iowa Oct. 22, 2019) (based on danger to the community in child exploitation case); *United States v. Smith*, 2020 WL 1903160 (D. Conn. Apr. 17, 2020) (denied notwithstanding heart condition that puts him at greater risk of COVID-19, upon consideration of 3553(a) factors, including the nature of child sex offense); *United States v. Pitcock*, 2020 WL 3129135, at *4 (S.D. Fla. June 12, 2020) (denied notwithstanding health conditions, as defendant possessed and transported a large volume of child pornography; "while the Defendant has served a majority of his sentence and has eleven months remaining, there is no evidence before the Court that he has completed any treatment regimen or programs that would inform whether the Defendant is no longer a danger.").

In sum, upon consideration of all pertinent factors, the motion for compassionate release should be denied.

Respectfully yours,

WILLIAM M. McSWAIN
United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals


*/s Kelly A. Lewis Fallenstein*
KELLY A. LEWIS FALLENSTEIN
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of this pleading has been served by first-class mail,

postage prepaid, upon:

Mr. Robert Oldham, Jr.
No. 68882-066
FCI Fort Dix
P.O. BOX 2000
Joint Base MDL, NJ  08640

*/s Kelly A. Lewis Fallenstein*
KELLY A. LEWIS FALLENSTEIN
Assistant United States Attorney

Dated:  December 28, 2020.